*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *No. 2:12-cr-28-GZS* |
| | ) | |
| *JESSICA BARTLETT,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Jessica Bartlett, indicted on three counts of Social Security fraud, in violation of 42 U.S.C. § 408(a)(7)(B), and three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), *see* Indictment (ECF No. 16), moves to suppress statements that she made during the booking process following her arrest on February 14, 2012, and evidence obtained as a result of a purportedly illegal search of her purse and wallet on that date, *see* Motion To Suppress ("Motion") (ECF No. 35) at 4-10. An evidentiary hearing was held before me on July 16, 2012, during which the defendant appeared with counsel. The government tendered three witnesses and offered five exhibits, all of which were admitted without objection. The defendant called one witness. After both sides rested, counsel for each argued orally. I now recommend that the following findings of fact be adopted and that the Motion be denied.

**I.  Proposed Findings of Fact**

At approximately 9 a.m. on February 14, 2012, a group of special agents and police officers (collectively, "officers") arrived at the defendant's residence at 18 Perryman Drive in Brunswick, Maine, to take her into custody pursuant to an arrest warrant that had been issued the previous day by this court. *See* Gov't Exhs. 1-2. Among the officers gathered at 18 Perryman Drive were Colleen Fleming, a special agent with the United States Department of Health and

1

Human Services ("HHS") Office of the Inspector General ("OIG"), and Julie Constant, a special agent with the Social Security Administration ("SSA") OIG.  Both Fleming and Constant had participated in an investigation of the defendant for Social Security fraud that led to the issuance of the warrant for her arrest on that charge.  *See id*.

Officers noticed a raised blind on a window near the front door, suggesting to them that someone was at home.  They announced their presence and knocked loudly enough on the door for approximately 10 minutes that they attracted the attention of neighbors, who opened their doors or walked outside to see what was happening.  However, no one answered the door at 18 Perryman Drive.

Officers asked Mark Judd, the father of one of the defendant's children, who was seated in a nearby patrol car following his arrest earlier that day, if he knew the defendant's whereabouts.  He stated that the defendant had taken their daughter to a doctor's appointment.  Several officers traveled to the doctor's office, where they learned that the defendant's daughter had been seen the day before.  Upon the officers' return to 18 Perryman Drive, they observed that a shade had been drawn since their departure.  They again knocked loudly and announced their presence.  No one responded.  A neighbor then opened her door and informed officers that the defendant, with whom the neighbor had been communicating on Facebook, was inside the residence.  More knocking produced no response.

Fleming then traveled a quarter of a mile away to a Brunswick Head Start program where she had observed Judd dropping off a small child earlier that day.  She confirmed with the director of the program that, if she placed a call from the program's phone, the call would be identified as coming from "Brunswick Head Start."  She then called the defendant's home phone number.  The defendant answered and confirmed that she was Jessica Bartlett.  Fleming

2

informed her that agents were there to arrest her and that she needed to open her door.  A Child Protective Services worker who had accompanied Fleming also spoke with the defendant, stating that she needed to open the door if she wanted to be an active participant in her children's safety plan.

Fleming returned to 18 Perryman Drive, observing that no officer had as yet entered the defendant's residence.  She enlisted the aid of the Perryman Drive housing authority to open the defendant's door.  Two Brunswick Police Department ("BPD") officers entered first, observing the defendant standing at the top of a staircase.  One of the BPD officers pointed a Taser gun at her and ordered her to come downstairs.  She did so, carrying her approximately four-month-old baby in her arms.  She was instructed to place her baby in a bassinet and then was handcuffed, searched, and read *Miranda* rights.[1]  The defendant deferred responding to the *Miranda* warning, stating that she wished to focus on the safety plan for her children.  Fleming told the defendant that, if she was cooperative, she would be released from handcuffs for purposes of attending to her baby.  The defendant's cuffs were removed, and she was allowed to retrieve and use a nasal aspirator, breastfeed her infant, and check the baby's diaper.  The defendant informed Fleming that the baby was having a hard time accepting a bottle.  As far as Fleming knew, the defendant was the baby's only food source.  Fleming concluded that the defendant needed to be booked and released as quickly as possible so that she would be available to feed her baby.

---

[1] Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda*, 384 U.S. at 478-79.

While, in knocking and announcing their presence, officers stated that they had a warrant for the defendant's arrest, no officer announced, prior to entering her residence, the charge on which she was being arrested.

Just prior to reapplying handcuffs on the defendant and transporting her to the U.S. Marshals Service ("Marshals Service") for booking, Fleming suggested that she take her driver's license or other photo identification with her.  Fleming did so for two reasons: because the Marshals Service asked for such identification and because having such identification is helpful in an identity theft case.  The defendant stated that she wanted to take her purse because she would need it upon her release.  The defendant pointed her purse out, and one of the agents retrieved it.  At no time during the conversation about the defendant's purse did any officer have his or her gun drawn.[2]

Fleming and Constant then escorted the defendant to a waiting car and took her to the Marshals Service in Portland, Maine.  Constant drove, and Fleming sat in the backseat keeping watch on the defendant.  Fleming glanced into the defendant's open purse, which she was carrying, but did not search it at that time.  Her focus was on monitoring the defendant.

During the approximately 45-minute drive, Fleming again read the defendant her *Miranda* rights.  The defendant said that she did not wish to speak with agents and wanted an attorney.  Neither Constant nor Fleming asked the defendant any substantive questions during the remainder of the ride.  On arrival at a secured parking lot outside of the Marshals Service, Fleming left the defendant's purse in the car, and Constant and Fleming escorted the defendant to the Marshals Service for intake.

---

[2] Constant also told the defendant, when officers first entered the residence, that she should take as few items as possible with her, perhaps a license and a little bit of money.  The defendant, who was then focused on a care plan for her children, did not respond.

4

Deputy U.S. Marshal Andrew Leconte was assigned the task of booking the defendant. As of the date of the suppression hearing, he had been a Deputy U.S. Marshal for about 19 months.  Prior to that time, he was a U.S. border patrol agent for one year in California.

When agents phone to arrange for the booking of a suspect by the Marshals Service, the Marshals Service asks three things: how many people have been arrested, when they are arriving to be booked, and the name of the arresting agency.  In making these arrangements, agents do not typically report the nature of the charges against an arrestee, and Fleming and Constant did not do so in this case.  Prior to booking the defendant, Leconte was informed by a supervisor that the arresting agency was HHS but was not told of the pending charges.  He was not involved in the investigation or arrest of the defendant and knew nothing about her case.

Leconte booked the defendant in a secure booking room at the Marshals Service, in the presence of Fleming, Constant, and another Deputy U.S. Marshal.  In Leconte's experience, at least one agent typically remains with a defendant during booking, and attorneys are not present during that process.  It is the practice of both Fleming and Constant to remain with a defendant during booking by the Marshals Service.  Leconte had previously booked defendants in cases in which Fleming or Constant was an investigating agent, and knew that Fleming worked for HHS and Constant for SSA.

During the booking of the defendant, neither Fleming nor Constant gave any instruction or direction to Leconte regarding what questions to ask.  Neither agent informed Leconte that the defendant had invoked her right to counsel, and Leconte did not ask whether she had.  Fleming did not feel that she had any obligation to do so because Leconte's job was to complete the booking process, not to ask questions related to her investigation.  Leconte is unaware of any Marshals Service policy pertaining to booking questions that might lead to incriminating

responses or to any necessity to inquire whether, prior to booking, a defendant has invoked his or her right to counsel. Until reading the briefs in this case, Fleming was unaware that there might be any issue with asking a defendant booking questions that might lead to incriminating responses.

As per his practice, Leconte started the process by pulling up a blank USM-129 Individual Custody/Detention Report form on his computer, automatically generating a USMS number on the form. *See* Gov't Exh. 3. He began asking questions in the order in which they appeared on the form, *e.g*., name, address, phone number, date of birth, sex, race, hair and eye color, height, and weight, and Social Security number. *See id*. The defendant answered all of those questions. Leconte also asked a question on the USM-129 form regarding the offense with which the defendant had been charged. Either Fleming or Constant answered, stating that she had been charged with Social Security fraud. Leconte asked the question concerning the defendant's charges after he had asked for her Social Security number.

As Leconte filled out the computerized form, he paused to ask questions pertaining to handwritten forms that he also had to complete, including a health insurance form and a form inquiring about finances, such as whether a person has bank accounts or owns a vehicle. Leconte does not recall whether he inquired about the defendant's bank accounts before or after he knew what charges were pending against her.

After Leconte completed the booking process, he placed the defendant in a holding cell pending her imminent initial appearance in court. Within 10 or 15 minutes of the conclusion of the booking process, Fleming retrieved the defendant's purse and brought it to a desk at the Marshals Service. Fleming and Constant then searched the purse and photocopied items that Fleming considered generally valuable, including cash, any identification or Social Security

cards, credit cards, and bank cards.  After completing this task, which took approximately 30 minutes, Fleming returned to the purse the originals of the items that she and Constant had photocopied and turned the purse over to the defendant's attorney, who by then was present for his client's initial appearance.

Fleming's agency, the HHS OIG, does not have an inventory search policy, but it is Fleming's practice to inventory the contents of items of which she has taken possession so that she cannot be accused of taking anything.  The SSA OIG Handbook contains a section on the inventory of personal property, which was in effect as of February 14, 2012, and which states, in relevant part:

> **Inventory of Personal Property** – Items of personal property (any movable or tangible thing that is subject to ownership and not classified as real property) removed from a person who has been arrested must be carefully inventoried by SAs [special agents] prior to being stored for safekeeping.
>
> a.      A receipt for such property should be prepared and given to the arrestee.
>
> b.      That inventory should be made in good faith, and not as a pretext or excuse for conducting a warrantless search for evidence.
>
> c.      The purpose of a legitimate inventory is to protect the owner's property; to protect the seizing agents from false claims; and/or to protect the SAs/general public from potential danger.
>
> d.      The inventory should include the contents of containers such as purses, shoulder bags, suitcases, etc., whether or not the containers are locked or sealed. . . .
>
> e.      Personal property *not* held as evidence shall be returned to the rightful owner.  SAs must document to whom the property was returned, the means by which it was returned (e.g. hand delivered directly to the owner, given to the owner's attorney, etc.) and the date on which the property was returned.  The person to whom the property is returned must sign and date a receipt . . . to acknowledge that the property was returned.  The original signed receipt shall be placed in the case file. . . .

Gov't Exh. 4 (emphasis in original).

After inventorying the defendant's purse, Constant did not prepare a receipt or provide one to the defendant. She acknowledges that she should have done so.

Fleming and Constant both considered the defendant's Social Security number an important piece of evidence in this case. Both knew that the Marshals Service would ask for that number as part of the booking process. Fleming was interested in the defendant's response to that question. Constant testified that the existence of bank accounts also is important in a Social Security fraud case. In a report describing the arrest and booking of the defendant, Fleming noted that, during the intake process, the defendant reported her Social Security number, which Fleming set out, and indicated that she had no bank accounts.

## II. Discussion

The defendant seeks to suppress (i) statements she made during the booking process regarding her Social Security number and her bank accounts, on the basis that they were elicited in violation of her Fifth Amendment right to counsel and do not fall within the "routine booking exception" to *Miranda*, and (ii) evidence seized from her purse, which she contends was illegally searched for the purpose of gathering incriminating evidence. *See* Motion at 6-10.[3]

The government bears the burden of proving compliance with the dictates of *Miranda*, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), which include the directive that, following a suspect's unambiguous invocation of the right to an attorney, police

---

[3] In her Motion, the defendant also argued that her arrest was unlawful because there was no valid arrest warrant and because officers violated the "knock and announce" requirements of 18 U.S.C. § 3109 by failing to inform her of the charges pending against her prior to entering her residence or afford her sufficient time to respond to their announcement. *See* Motion at 4-6. At hearing, the defendant's counsel expressly withdrew the claim of lack of a valid arrest warrant and implicitly withdrew the "knock and announce" claim by failing to raise it during oral argument. To the extent that the defendant means to continue to press the "knock and announce" claim, even assuming *arguendo* that a violation occurred, it provides no basis for the requested relief of suppression of evidence. *See, e.g., Hudson v. Michigan*, 547 U.S. 586, 599 (2006) (exclusion of evidence is not an appropriate remedy for a violation of the knock and announce rule); *United States v. Jones*, 523 F.3d 31, 36 (1st Cir. 2008) ("In the wake of *Hudson*, we have recognized the absence of an exclusionary rule for knock-and-announce violations, provided the police have a valid arrest warrant or some other valid grant of authority to enter the target's residence, and reason to believe the target is inside.").

must cease questioning him or her until an attorney is present, *see, e.g., United States v. Olsen*, 609 F. Supp. 1154, 1158 (D. Me. 1985).  The government also bears the burden of demonstrating the lawfulness of warrantless searches and seizures.  *See, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992).

For the reasons that follow, I conclude, and recommend that the court find, that the government has met its burden with respect to the elicitation of statements from the defendant during the booking process and the search and seizure of evidence from her purse.

## A.  Elicitation of Statements During Booking Process

In *Edwards v. Arizona,* 451 U.S. 477 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning of a suspect who clearly asserts his or her right to have counsel present during interrogation.  *See Edwards*, 451 U.S. at 484-85.  *See also, e.g.*, *United States v. Libby*, No. CRIM. 04-26-B-W, 2004 WL 1701042, at *6 (D. Me. July 30, 2004) (rec. dec., *aff'd* Sept. 27, 2004) ("If a defendant subjected to custodial interrogation unequivocally invokes his right to counsel, all questioning must cease.  To activate the prohibition on continued questioning, however, the request for counsel must be unambiguous.") (citations omitted).

There is no dispute that the defendant unequivocally invoked her right to counsel prior to being booked by the Marshals Service.  She seeks to suppress her answers to two questions asked during booking, regarding her Social Security number and her bank accounts, on the basis that those questions ran afoul of her right to counsel because they were outside the scope of a legitimate booking process and were designed to elicit incriminating responses.  *See* Motion at 8.  Without conceding the legitimacy of this argument, the government represents that "it does not intend to use the defendant's statements about bank accounts in its case-in-chief."  Government's

Response to Defendant's Motion To Suppress ("Response") (ECF No. 41) at 5 n.4.  I expect the government to honor this pledge and, hence, focus on whether the suppression of the defendant's statement regarding her Social Security number is warranted.

The government argues that there was no transgression of the defendant's *Miranda* rights, or her right to counsel, because the questions asked by Leconte fell within the routine booking exception.  *See id*. at 4-7; *see also, e.g.*, *United States v. Foster*, 227 F.3d 1096, 1102-03 (9th Cir. 2000) (noting that officers permissibly may ask routine booking questions even after a suspect invokes right to counsel); *United States v. Granero*, Nos. CRIM.91-578-1, CIV.94-5040, 1995 WL 394140, at *7 (E.D. Pa. June 30, 1995) (noting that routine booking questions "may be asked of a suspect who has invoked the right to remain silent without violating his or her constitutional rights").

The booking exception "exempts from *Miranda's* coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation and internal quotation marks omitted).  However, there is an exception to the exception, on which the defendant relies: It does not apply "where the law enforcement officer, in the guise of asking for background information, seeks to elicit information that may incriminate."  *United States v. Reyes*, 225 F.3d 71, 76 (1st Cir. 2000) (citation and internal quotation marks omitted); *see also Muniz*, 496 U.S. at 602 n.14 ("Recognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception.  Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.") (citation and internal punctuation omitted).  Although the inquiry is "phrased in terms of the officer's intention," it is "actually an objective

10

one: whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response." *Id*. at 76-77.

The First Circuit has had occasion to construe the exception to the booking exception in two cases, *Reyes* and *United States v. Doe*, 878 F.2d 1546 (1st Cir. 1989). In *Reyes*, Walter Smith, an Immigration and Naturalization Service ("INS") agent assigned to work with the Drug Enforcement Administration ("DEA"), questioned the defendant for purposes of booking him following his arrest on a charge of participating in a criminal drug conspiracy. *See Reyes*, 225 F.3d at 74. Smith advised the defendant of his *Miranda* rights but did not seek a waiver of those rights prior to requesting his name, date of birth, and Social Security number. *See id*. Although the drug-conspiracy charge against the defendant was dropped, he ultimately was charged with making false statements in violation of 18 U.S.C. § 1001 based on an allegedly false name, date of birth, and Social Security number given in response to the booking questions. *See id*. at 75.

The First Circuit held that the booking exception applied, rendering the statements admissible, inasmuch as (i) Smith asked only those questions found on the standard DEA booking form, with no reference to the charge on which the defendant was being booked, (ii) the booking interview was conducted separate from any substantive interrogation, which was performed by a different officer in a different room at a different time, and (iii) it was not reasonably foreseeable that the questions would elicit an incriminating response inasmuch as they bore no direct relevance to the charge of criminal drug conspiracy on which the defendant was being booked. *See id*. at 77. The First Circuit observed:

> [W]e think that it would be a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate *Miranda*. We can imagine situations, of course, that would present a closer case than this one. For example, asking a person's name might reasonably be expected to elicit an incriminating response if the individual were under arrest for impersonating a law enforcement officer or for some comparable offense focused on identity; likewise,

11

> asking an individual's date of birth might be expected to elicit an incriminating response if the individual were in custody on charges of underage drinking; and questions about an individual's Social Security number might be likely to elicit an incriminating response where the person is charged with Social Security fraud. In such scenarios, the requested information is so clearly and directly linked to the suspected offense that we would expect a reasonable officer to foresee that his questions might elicit an incriminating response from the individual being questioned.

*Id.*

In *Doe*, by contrast, the First Circuit held that the booking exception did not apply. *See Doe*, 878 F.2d at 1550-52. In that case, Coast Guard officers aboard a U.S. Navy destroyer sought to board a British-registered sailboat in the Caribbean. *See id*. at 1548. The sailboat maneuvered dangerously close to the destroyer, caught fire and sank, whereupon several bales of marijuana rose to the surface. *See id*. The Coast Guard rescued and arrested the sailboat's occupants. *See id*. Prior to administering any *Miranda* warning, the Coast Guard asked the defendants their names and citizenship. *See id*. at 1550. They stated that they were American citizens. *See id*. The defendants ultimately were charged, *inter alia*, with violation of a statute making it an offense for any United States citizen on board any vessel to possess drugs with intent to distribute them. *See id*. The First Circuit observed:

> [T]he administrative need for initial background questioning seems less great here than typically present at a police station, where one officer may book a suspect in one room before another questions the suspect at greater length elsewhere. Here, the same officer asked the identification questions as the substantive questions, and the record suggests that he could easily have offered a *Miranda* warning before asking about citizenship. For another thing, questions about citizenship, asked on the high seas, of a person present on a *foreign* vessel with drugs aboard, would (in our view) seem reasonably likely to elicit an incriminating response. When, or whether, the United States can prosecute a person found on such a ship is not immediately obvious; and the possibility that prosecution will turn upon citizenship is great enough (and should be well enough known to those in the drug enforcement world) that Coast Guard officers ought to know that answers to such questions may incriminate.

12

*Id.* at 1551-52 (citation and internal quotation marks omitted) (emphasis in original).

At hearing, the defendant's counsel argued that this is the very case hypothesized in *Reyes*: an individual charged with Social Security fraud was asked her Social Security number during a booking process carried out by someone who was not a member of the investigative team. He argued that (i) the knowledge of the special agents should be imputed to the booking officer, as is the case with respect to analysis concerning whether there is probable cause to effect a warrantless arrest, *see, e.g., United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997) ("Probable cause is to be determined based on the collective knowledge and information of all the officers involved.") (citation and internal quotation marks omitted), and, (ii) even if there is no such imputation, a reasonable officer in Leconte's shoes should have known, based on his awareness that the arresting agencies were HHS and SSA and his background as a border patrol officer, that a question regarding a suspect's Social Security number could elicit an incriminating response.

Counsel for the government contended that the concerns raised in dictum in *Reyes* are not present in this case. He noted that, in *Reyes*, the officer conducting the booking did appear to have been a member of the investigative team. He reasoned that, in any event, in this case, Leconte was not involved in the investigation, had no reason to seek to elicit incriminating information, and asked the same routine booking questions that he asks of all suspects, doing so strictly for administrative purposes. He observed that Fleming and Constant had a legitimate reason for being present during booking and did not direct Leconte's questioning. He took issue with the notion that, in the context of the exception to the booking exception, agents' knowledge should be imputed to a booking officer.

As a threshold matter, it is not clear whether the INS agent who booked the defendant in *Reyes* was a member of the DEA drug investigation team.  He had been assigned to work with the DEA, *see Reyes*, 225 F.3d at 74; yet, there is no indication that he participated in the investigation leading to Reyes' arrest on drug charges, *see id*. at 73-74, and he had no further contact with Reyes after booking him, *see id*. at 74.  Regardless, the questioning deemed to fall within the booking exception in *Reyes* bears a striking resemblance to the questioning by Leconte in this case.  Here, as in *Reyes*, (i) Leconte "asked only those questions indicated on the standard . . . booking form, with no reference whatsoever to the offense for which [the defendant] had been arrested[,]" and (ii) "[t]he booking interview was conducted separate from any substantive interrogation, by a different officer and in a separate room at a separate time, just as we suggested in *Doe* would be typical of legitimate, routine booking interviews."  *Id*. at 77.

Nonetheless, whereas in *Reyes*, questions regarding the defendant's name, date of birth, and Social Security number bore no direct relevance to the drug conspiracy charges on which he was being booked, this is the "closer case" envisioned by the First Circuit, in which a booking officer questioned a person charged with Social Security fraud about her Social Security number.  Yet, on this record, I conclude that a reasonable officer in Leconte's shoes should not have been expected to foresee that this question might elicit an incriminating response.

First, I reject the defendant's counsel's suggestion that it is appropriate to impute the knowledge of Fleming and Constant to Leconte.  The defendant does not cite, and I cannot find, any case upholding an imputation of knowledge in that context.  At least one court, the United States Court of Appeals for the Ninth Circuit, has declined to apply the "collective knowledge" principle in assessing the applicability of the routine booking exception.  *See United States v. Salgado*, 292 F.3d 1169, 1174 (9th Cir. 2002) ("Here, . . . Holz [the booking officer] was an

Orange police officer, not a criminal investigator for the INS, and there is no question that his was a 'true' booking.  We decline to impute to Holz knowledge that he did not have at the time – that later Salgado would be prosecuted on immigration charges – or a purpose that he did not have – to ask booking questions on behalf of the INS.").  The meaningfulness ascribed by the First Circuit to a separation of the booking and investigative processes, *see Reyes*, 225 F.3d at 77, persuades me that it would side with the Ninth Circuit in declining to impute investigative agents' knowledge to a booking officer who was not a member of the investigative team.

As of the time that Leconte asked the defendant her Social Security number, he knew only that she had been arrested as a result of an investigation in which HHS and SSA were involved.  He did not know that she had been charged with Social Security fraud.  At hearing, the defendant's counsel argued that Leconte's knowledge that the charging agencies were HHS and SSA, together with his background as a border patrol agent, would have put a reasonable booking officer in his shoes on notice that a question regarding one's Social Security number might elicit an incriminating answer.  He noted that, as a border patrol agent, Leconte had arrested people on charges of attempting to cross into the United States illegally, a context in which, he argued, questions about a person's identity or Social Security number could be expected to elicit an incriminating response.  Nonetheless, while Leconte did testify that he arrested violators while a border patrol agent and was familiar with *Miranda*, he gave no testimony regarding his questioning of suspects.  I am unpersuaded that a mere knowledge of the identity of the charging agencies, coupled with a possible concern in a different context about the incriminating nature of identity questions, sufficed to place a reasonable booking officer in Leconte's shoes on notice that a routine booking question regarding one's Social Security number might elicit in incriminating response.

In the circumstances, the government makes a persuasive case for the application of the routine booking exception. As the government argues, *see* Response at 7, the mere fact that a statement made during booking happens to be relevant to a criminal prosecution is not a basis for suppression, *see, e.g., United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating.") (citation and internal quotation marks omitted). Leconte was not involved in the investigation leading to the defendant's arrest and had no knowledge regarding it, asked standard booking questions for administrative purposes, and did not know, when asking the defendant for her Social Security number, that she was accused of committing Social Security fraud. For these reasons, I recommend that the court decline to suppress the defendant's statement in response to that question.[4]

## B. Search of Purse

Lastly, the defendant seeks to suppress the photocopies of contents of her purse made by Fleming and Constant following an assertedly illegal warrantless search. *See* Motion at 9-10. She argues that "the agents and officers did not search her purse or wallet incident to arrest" and that their purported inventory search "was unjustified as an inventory search and was performed

---

[4] At the hearing, counsel for the government noted that a petition for certiorari was recently filed with the U.S. Supreme Court with respect to *Alford v. State*, 358 S.W.3d 647 (Tex. Crim. App. 2012). In *Alford*, the Court of Criminal Appeals of Texas declined to adopt a "should have known" test for analyzing the applicability of the routine booking exception. The *Alford* court reasoned, "What would be the purpose of asking whether a question is a 'booking question' if, regardless of the answer, admissibility of the response ultimately turns on whether the question was reasonably likely to elicit an incriminating response? This is an absurd reading of *Muniz*, which cannot reasonably be interpreted as intending to negate, in a single footnote in the analysis, the exception it had set forth in that same analysis." *Alford*, 358 S.W.3d at 660. The *Alford* court adopted a test entailing analysis of "whether, under the totality of the circumstances, a question is reasonably related to a legitimate administrative concern." *Id.* at 661. Only if a question lacked a legitimate administrative purpose would an appellate court proceed "to determine the admissibility of the response under the general should-have-known test for custodial interrogation." *Id.* The pendency of the May 1, 2012, petition of certiorari, while of interest, has no bearing on the instant decision, in which I have applied the routine booking exception as construed in *Doe* and *Reyes*.

in bad faith and solely for investigative purposes (i.e., to search for and photocopy evidence related to the charges of Social Security fraud and aggravated identity theft.)." *Id*. The government rejoins that the search was a legitimate search incident to arrest or, alternatively, a legitimate inventory search. *See* Response at 3-4 & n.3. The government has the better argument.

As the First Circuit has observed, "it is . . . well settled that a search incident to a valid arrest may be made without procurance of a warrant." *United States v. Cruz Jimenez*, 894 F.2d 1, 7 (1st Cir. 1990). The search must be limited to "an area in the immediate control of the defendant[.]" *Id.* The search need not be conducted simultaneously with the arrest, so long as it is conducted within a reasonable time after officers obtain control of the item in question. *See, e.g., United States v. Edwards*, 415 U.S. 800, 801-03 (1974) (validating, as a search incident to arrest, a jailhouse seizure and search of a defendant's clothing approximately 10 hours after his arrest, when jail authorities finally were able to provide substitute clothing for him; stating, "[B]oth the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence."); *United States v. Nelson*, 102 F.3d 1344, 1346 (4th Cir. 1996) ("Although the 'incident to arrest' justification for warrantless searches does not permit an indefinite delay in a search, the justification does last for a reasonable time after the officers obtain exclusive control of the container that is to be searched.") (citations omitted).

The defendant's purse seemingly was in an area of her immediate control. She pointed it out to agents when stating that she wanted it with her. The search was conducted within a reasonable time of her arrest. Fleming felt a sense of urgency in processing and releasing the defendant because of the defendant's baby's difficulty taking a bottle. After the defendant was

17

permitted to attend to her baby, she was promptly taken to the Marshals Service for booking. Fleming and Constant, who were busy transporting the defendant to Portland and, per their standard practice, were present for her booking, searched the purse at the earliest practicable opportunity, within minutes of the conclusion of the booking process. The purse thus was lawfully searched incident to the defendant's arrest.

In any event, as the government alternatively argues, *see* Response at 4 n.3, even if the purse was not validly searched incident to the defendant's arrest, it was subjected to a lawful inventory search.

"[I]nventory searches are . . . a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id*. at 372. Absent a "showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation[,]" such searches have been upheld. *Id*.

"[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). "The policy or practice governing inventory searches should be designed to produce an inventory." *Id*. "The individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime." *Id*. (citation and internal quotation marks omitted). "But in forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion." *Id*.

At hearing, the defendant's counsel argued that one can reasonably infer that the agents sought to search the purse for incriminating evidence, rather than to inventory its contents, because the purse was likely to contain important evidence of the crime of Social Security fraud, such as a Social Security card or other identification, and agents did not follow the SSA OIG inventory policy, which contemplates an inventory search only in circumstances in which property is going to be "stored for safekeeping."  Gov't Exh. 4.  He noted that, in this case, the purse was immediately turned over to the defendant's counsel following the search, rather than stored for safekeeping.  He suggested that the immediate turnover of the purse after its search further calls into question any need of the agents to search it for inventory purposes, as opposed to searching it for incriminating evidence.

As counsel for the government countered, however, the fact that agents seized the purse at the defendant's request and, consistent with her wishes, turned it over to her counsel prior to her release, strongly undermines any inference that they searched it for purposes of finding incriminating evidence.  Moreover, the inventory was consistent with Fleming's standard practice and largely consistent with the HHS OIG policy.  Although Fleming was unaware of any HHS OIG inventory policy, she testified that she searched the purse pursuant to her standard practice because agents were responsible for it while it was in their custody, and she did not wish to be accused of the theft of any of its contents.  While Constant conceded that she failed to follow her agency's policy of providing the defendant with a receipt following the inventory, she strongly disagreed, on cross-examination, that the policy did not contemplate an inventory in circumstances in which an item is immediately returned to a suspect.

The defendant's counsel's reading of the SSA OIG inventory policy is a colorable, but ultimately an overly technical and narrow, one.  The policy states that the purpose of a legitimate

inventory search is "to protect the owner's property; to protect the seizing agents from false claims; and/or to protect the SAs/general public from potential danger." *Id*. That purpose would not be served if agents declined to search seized property because they intended to return it promptly to a suspect. Pursuant to the policy, inventories are to include "the contents of containers such as purses[.]" *Id*. The policy directs the return of property not held as evidence to its rightful owner and the provision of a receipt to the owner, implying that property must be inventoried prior to its return, even if it is not held for safekeeping following a search. *See id*.

Pursuant to the SSA OIG policy, Constant properly assisted in the inventory of the contents of the purse prior to turning the purse over to the defendant's counsel. That Constant did not follow the SSA OIG inventory policy to the letter, failing to provide the defendant with a receipt, is not fatal to the government's reliance on the inventory search exception to the warrant requirement. *See, e.g., Bertine*, 479 U.S. at 369-70, 375-76 (upholding finding that inventory search of vehicle was conducted for legitimate purposes in light of standardized criteria, despite being performed in a "somewhat slipshod" manner) (citation and internal quotation marks omitted); *United States v. Mundy*, 621 F.3d 283, 293 (3d Cir. 2010) (officers' failure to complete a Towing Report describing personal effects left in vehicle did not demonstrate that they conducted an inventory search as a pretext or in bad faith; "Although compliance with procedures tends to ensure the intrusion is limited to carrying out the government's caretaking function, failure to follow through with standard procedures does not necessarily render the search unreasonable.") (citation and internal quotation marks omitted); *United States v. Lopez*, 547 F.3d 364, 371-72 (2d Cir. 2008) ("It would serve no useful purpose to require separate itemization of each object found, regardless of its value, as a precondition to accepting a search as an inventory search. Such an obligation would furthermore interfere severely with the

enforcement of the criminal laws by requiring irrational, unjustified suppression of evidence of crime where officers, conducting a *bona fide* search of an impounded vehicle, found evidence of serious crime but, in making their inventory, failed to distinguish between the maps of Connecticut and New York, or failed to list separately the soiled baby blanket or a pack of gum."); *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998) (observing, "although adherence to procedures shows lack of pretext, deviation from procedures does not prove pretext"; holding that officers' failure to complete inventory list at scene of impoundment when seized items were later listed on an inventory form did not invalidate inventory search); *United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986) ("We will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search.").

Finally, even to the extent that Fleming or Constant may have been motivated *in part* to search for evidence, that is not fatal to the government's reliance on the inventory exception. *See, e.g., Lopez*, 547 F.3d at 372 ("[T]he Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search."); *United States v. Gordon*, 23 F. Supp.2d 79, 84 (D. Me. 1998) ("As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure.") (citation and internal quotation marks omitted).

The evidence, as a whole, indicates that Fleming and Constant took the defendant's purse and returned it quickly as an accommodation to her, and that they searched its contents and photocopied those of general value pursuant to Fleming's practice, and the SSA OIG policy, of inventorying seized items to protect the owner's property and to protect the seizing agents from

false claims.  That they were also interested in obtaining evidence, and photocopied items that could be used as evidence against the defendant, did not in those circumstances invalidate the search.

For these reasons, I recommend that the court decline to suppress evidence seized from the defendant's purse.

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 31st day of July, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge